No. 3-06-0365

Filed May 4, 2007.
IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| TERRY L. SIEKIERKA, | ) | Appeal from the Circuit Court |
| | ) | for the 13th Judicial Circuit, |
| Plaintiff-Appellant, | ) | LaSalle County, Illinois |
| | ) | |
| v. | ) | No. 02-L-182 |
| | ) | |
| UNITED STEEL DECK, INC., | ) | Honorable Eugene P. Daugherity |
| | ) | Judge, Presiding |
| Defendant-Appellee. | ) | |

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiff Terry L. Siekierka filed a complaint against defendant United Steel Deck, Inc., alleging United Steel had wrongfully discharged Siekierka in retaliation for his assertion of his rights under the Illinois Workers' Compensation Act. 820 ILCS 305/1 *et seq*. (West 2002). United Steel filed a motion for summary judgment. Following discovery and a hearing on the motion, the trial court granted United Steel summary judgment and Siekierka follows with this appeal. We reverse the trial court.

FACTS

Plaintiff Terry L. Siekierka filed a complaint against defendant United Steel Deck, Inc., alleging United Steel wrongfully discharged Siekierka in retaliation for his assertion of his rights under the Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq*. (West 2002)). In his complaint, Siekierka made the following allegations. Siekierka alleged that on May 11, 2001, he

was injured while performing his duties as an employee of United Steel. Siekierka pursued his rights to compensation under the Act, including compensation for medical treatment and temporary total disability benefits (TTD). On August 31, 2001, while Siekierka was in the process of recuperating from the effect of his work-related injury, United Steel terminated Siekierka's employment. Siekierka alleged in his complaint that the termination was unreasonable, without just cause, and motivated in part because he had pursued his rights and remedies under the Act. Siekierka sought relief for compensatory and punitive damages. In response to Siekierka's complaint, United Steel answered as a defense that its action in terminating Siekierka was unrelated to his pursuit of workers' compensation rights and that Siekierka's failure to return to work within his authorized leave period was a legitimate reason for his discharge. United Steel moved for a summary judgment which the trial court granted.

The record *sub judice* consists of the following depositions, exhibits, affidavits and proceedings. The record contains a letter to Siekierka from Kristine Paul, a human resources manager with the United Steel plant in Peru, Illinois. In the letter, dated July 31, 2001, Paul informed Siekierka that he had been off work since May 14, 2001; that his 12 weeks of family leave would end on August 6, 2001, and that United Steel was willing to extend his leave for "one month," to the end of August. Paul further informed Siekierka that if he was unable to return to work by the end of August he would be terminated and offered "COBRA" coverage. Paul later informed Siekierka, by way of a letter dated August 31, 2001, that he was terminated and that his workers' compensation benefits would continue until he recovered. She also invited him to apply for re-employment with United Steel once he was released to work again.

Medical doctor Steven C. Delheimer testified by way of deposition. Delheimer attested he

specializes in neurosurgery.  Delheimer first examined Siekierka on May 21, 2001.  As of May 24, 2001, Delheimer had documented Siekierka as "totally incapacitated."  Delheimer recalled when he saw Siekierka on June 4, 2001, he scheduled him to undergo surgery on June 11, 2002.  Delheimer was informed by "the insurance company" that surgery was not authorized.  He did not see Siekierka again until August 6, 2001.

Delheimer stated when he saw Siekierka on August 6, 2001, his condition was no worse than on the June 4, 2001, visit.  Delheimer acknowledged Siekierka's surgery took place on August 15, 2001, and it took three months, until November 15, 2001, for him to fully recover.  Delheimer opined that had Siekierka undergone surgery as originally scheduled, he would have been back to work by August 31, 2001.  Delheimer would have advised Siekierka to proceed with the surgery and would have sent Siekierka back to work a little earlier if he had known he was in danger of losing his employment.  Delheimer opined there was nothing gained by Siekierka in delaying the surgery.  The surgery was postponed solely because of the lack of authorization from the insurance company.

The record contains a letter from medical doctor David Shenker to Liberty Mutual Insurance, United Steel's insurer.  In his letter, Shenker acknowledged that on July 11, 2001, he performed a neurological evaluation of Siekierka as a second opinion. Shenker noted Siekierka had been employed as a machine operator at United Steel for over 1 ½ years.  Shenker stated Siekierka's injury occurred as a result of activity related to removing sheets of steel off of a conveyor.  Shenker documented Siekierka symptoms and noted the severity of his pain had diminished since the injury.  Shenker considered Siekierka's prognosis uncertain but opined he was improving.  The doctor recommended Siekierka remain off of any heavy-duty work and take a wait-and-see approach for a month before considering whether to have surgery; he stated that any surgery would be related to

3

the May 11, 2001, incident. Shenker's letter is initialed at the bottom by Delheimer, following the notation, "agree to waiting for a period of time. " Delheimer acknowledged in his deposition that he had reviewed Shenker's report.

Terry Siekierka was also deposed. Siekierka attested that on November 29, 1999, he had signed a document indicating he had received training from United Steel with respect to the Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. A. §2601 *et seq*. (2000)). He did not recall whether he was informed that under the FMLA policy of the company, "[e]mployees who fail to return to work after expiration of the requested leave, in the absence of any other approved form of leave, will be deemed to have resigned their employment with the company." Siekierka did not know the FMLA could apply to a work-related injury. Siekierka also attested to his signature on a document that indicated he had received United Steel's employee handbook, which contains a provision explaining the FMLA and which states that "excessive absenteeism" may result in dismissal. Siekierka acknowledged other documentation reflecting conversations he had "on and off" with United Steel personnel before he was terminated. Siekierka stated the documentation accurately reflected the content of his conversations.

Siekierka testified he was under the impression until he was terminated that he was going to be allowed to return to work after he recovered from his injury. He stated "everything was pretty much kept on a positive note" when he was in contact with United Steel personnel. He was notified by a letter dated July 31, 2001, that he had to be back to work by the end of August or he would be terminated. Siekierka stated his surgery was rescheduled for August 15, 2006. Siekierka indicated as obvious the impossibility of returning to work by the end of August when the surgical recovery was estimated to be four to eight weeks. Siekierka referred to United Steel's insurer insisting he see

4

a second physician after he had consulted with Delheimer. Siekierka attested it took a month to get in to see the second physician, Shenker, after which Shenker recommended he wait another month to heal. Siekierka stated that eight weeks were "shot right there." He opined that had he had the surgery as originally scheduled, he could have returned to work within the 12-week allotment.

Siekierka attested that after Delheimer gave him a full duty medical release to work on November 15, 2001, he contacted the company about reemployment and was told it was not hiring at the time. Siekierka agreed that as workers' compensation benefits, for the period of May 15, 2001, to November 19, 2001, he received $293.33 a week. His workers' compensation claim was settled for $27,355 as per a directive approved in February of 2003. Siekierka opined that United Steel did not look "too fondly on people that get hurt at work." He recalled that one employee who had experienced several job-related accidents was considered "accident prone" by company managers.

Paul, the human resources manager, also testified by way of deposition. Paul stated that when a worker is injured at United Steel she reports the injury to Liberty Mutual, the company's workers' compensation insurer. Thereafter, she does not monitor the claim or participate in further decision making with respect to the workers' compensation claim, however, she does receive updates on the claim from the insurer. Paul admitted the United Steel employee handbook does not contain a section explaining the workers' compensation policy.

Paul attested that the FMLA policy was established at United Steel in 1999. The FMLA is explained in the employee handbook, which indicates that the use of family medical leave "cannot result in the loss of employment benefits that accrued prior to the start of employee's leave." Paul stated the federal FMLA policy mandates up to 12 weeks of leave and she and Ron Grant, the plant manager, decide whether to extend the leave for a particular worker. The grant of an extension is

5

done on a case-by-case basis, and depends on factors including the nature of the injury or illness. Paul stated that before a decision is made to extend the leave, she looks at all the different company policies and laws, including, the FMLA, workers' compensation, short-term disability and the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. §12132 (2000)). Paul admitted that a person under leave through ADA would be granted more time to return to work because the law mandated it.

Paul acknowledged Siekierka was considered a good employee. Paul recalled no dispute over whether Siekierka's injury was work-related. When she received notice of Siekierka's injury she notified the insurance carrier. Paul admitted Siekierka did not request to be put on FMLA. Paul stated the FMLA may be initiated by the employee or the employer. Paul notified Siekierka on July 31, 2001, that the leave had been applied to him and that it was going to expire on August 6, 2001. United Steel gave Siekierka an extension of his leave from August 6 to August 31. At the time the extension was granted, Paul was aware of Shenker's report.

Paul recalled meeting with Grant and Siekierka on August 14, 2001, when Siekierka asked for a further extension of leave. Siekierka informed Paul and Grant he was to have surgery on August 15 and it would take four to eight weeks for him to recover. After Siekierka left, Grant and Paul discussed the possibility of extending Siekierka's leave. According to Paul, factors they considered included past practice; an employee with cancer, Jack Downey, had been given 3 ½ months of leave, including FMLA; he did not receive workers' compensation. Another employee who did file for workers' compensation was given a nine-day extension beyond FMLA. Paul stated that she and Grant considered an additional two-month extension would be excessive in light of company consistency and fairness to all the United Steel Peru plant employees. Paul stated she and

6

Grant were concerned about setting a precedent regarding work-related injury leaves. She could not recall ever granting an extension of longer than a month. Ron Francisco of the New Jersey office concurred with their judgment. Siekierka was not given an additional extension. According to Paul, the decision to grant or deny an extension was not related to Siekierka's workers' compensation claim. She was aware that without a further extension, in light of his impending surgery, Siekierka would not be able to return to work.

Ron Grant, the plant manager for the United Steel facility in Peru, was also deposed. Grant stated to his knowledge the company had only one leave policy, the FMLA, and no separate policy that related to injured workers. Grant attested the FMLA policy allows for a 12-week period of leave, after which, if the company does not grant an extension, the employee is terminated. Grant stated he considered a four-week extension to be fair to the employee without detracting from the operation of the company.

Grant acknowledged Siekierka was a good employee. Grant stated the decision to extend additional time to Siekierka did not relate to his workers' compensation claim but was in keeping with the extension given to another employee, Jack Downey, who had been ill in a way unrelated to work. Grant admitted that by August 14, 2001, he and Paul had already decided they would not grant Siekierka an additional extension, although he told Siekierka he would take the matter up with the New Jersey office. When Grant spoke to the vice president of United Steel manufacturing, Kevin Gennarelli, Gennarelli endorsed the decision not to extend Siekierka's leave. Grant stated the only other policies that would allow an employee additional leave time would be related to some type of disability or a military necessity.

Grant acknowledged he recognized that in light of Siekierka's pending surgery, he was

7

unlikely to return to work without another extension. Grant admitted that under the company's operating policy, any worker who, like Siekierka, took longer than four months to recover from a work-related injury, would be terminated. Grant acknowledged an employee who previously filed workers' compensation claims was later terminated for insubordination. Grant also recalled another workers' compensation claimant employee who was terminated when he failed to appear for work after the expiration of his family leave, plus a few days' extension.

James Francisco was deposed by telephone. Francisco is the human resources director for United Steel, based in New Jersey. Francisco acknowledged he was instrumental in developing the employee handbook for United Steel. Francisco stated the handbook contains no information about an employee's rights under the Workers' Compensation Act. According to Francisco, workers' compensations claims are a routine matter handled through the company's workers' compensation insurer. He considers them an insurance matter.

Francisco knew of no employee, who, following a work-related injury, was allowed more than four months to return to work. Francisco stated that for the Peru facility, the leave granted to employee Downey, who was afflicted with cancer, was the benchmark used to determine a fair balance between the needs of the employee and the company's business needs. Francisco attested the company's leave policy has no relation to an employee's retention of workers' compensation benefits; he also stated Siekierka was not terminated because he filed a workers' compensation claim.

Kevin Gennarelli, was also deposed by telephone. Gennarelli is the vice president of United Steel based in New Jersey. Gennarelli stated he, Grant and Paul had agreed to accommodate Siekierka in the same manner they had accommodated Downey, giving him a one-month extension

8

of his family leave, the most they had ever given anyone. Gennarelli admitted that even if the only reason Siekierka could not return to work was because he was recuperating from the effects of a work related injury, Gennarelli would not have further extended Siekierka 's leave; he would not want to jeopardize the company's leave policy. Gennarelli acknowledged that an employee in need of more than four months recuperation from a work-related injury would not be able to keep a position at United Steel.

Following a hearing, the trial court granted United Steel's summary judgment motion. Siekierka follows with this appeal, in which he asserts the trial court erred in granting the summary judgment motion. Siekierka argues, in part, that there is a genuine issue of material fact as to whether there is a causal nexus between Siekierka's discharge and the exercise of his rights under the Act.

ANALYSIS

Our review of a summary judgment ruling is *de novo*. Sheth v. Wunderlich 363 Ill. App. 3d 252, 254, 842 N.E.2d 1155, 1157 (2006). Summary judgment is proper when, viewed in a light most favorable to the nonmovant, the pleadings, affidavits, depositions, admissions, and exhibits on file reveal there is no issue as to any material fact and the movant is entitled to judgment as a matter of law. Sheth, 363 Ill. App. 3d at 254, 842 N.E.2d at 1157. In ruling on a motion for summary judgment, the trial court should construe the pleadings, affidavits, exhibits, and depositions most strictly against the moving part and most liberally in favor of the opponent. Bray v. Stan's Rental, Inc., 196 Ill. App. 3d 384, 386, 553 N.E.2d 791, 792 (1990). Furthermore, "summary judgment is not intended to be used as a means of weighing conflicting issues of fact." Bray, 196 Ill. App. 3d at 386, 553 N.E.2d at 792.

9

Under section 4(h) of the Act, it is unlawful for "any employer, individually or through any insurance company or service or adjustment company, to discharge or threaten to discharge *** an employee because of the exercise of his or her rights or remedies granted to him or her by [the] Act." 820 ILCS 305/4(h) (2002). Because the workers' compensation law replaced common-law rights available to employees and employers, the court in Kelsay v. Motorola, Inc., 74 Ill. 2d 172, 180-81, 384 N.E.2d 353, 356-57 (1978), carved out an exception to the general rule that an employer may fire an at-will employee for any reason or for no reason at all. The Kelsay court reasoned that the sound public policy underlying the Act dictated the recognition of an employee's cause of action for retaliatory discharge. Kelsay, 74 Ill. 2d at 181, 384 N.E.2d at 357. An underlying principle of the retaliatory discharge exception to the general rule of at-will employment is the recognition that an employer may not present the employee with a choice between his job and his legal entitlement to compensation. See Kelsay, 74 Ill. 2d at 182, 384 N.E.2d at 357 (stating that workers' compensation law would be seriously undermined if employers were permitted to abuse their power to terminate by threatening to discharge employees for seeking compensation under the Act). Kelsay prohibits an employer from utilizing an employee's job as leverage to condition his exercise of rights under the Act. Hartlein v. Illinois Power Co., 151 Ill. 2d 142, 166, 601 N.E.2d 720, 731 (1992)

Cases brought for retaliatory discharge predicated on an employee's filing of a workers' compensation claim are reviewed using traditional tort analysis. Clemons v. Mechanical Devices Co., 184 Ill. 2d 328, 339, 704 N.E.2d 403, 408 (1998). The burden rests with the plaintiff to prove the elements of the cause of action. Clemons, 184 Ill. 2d at 337, 704 N.E.2d at 407. To sustain a cause of action for the tort of retaliatory discharge based upon the filing of a workers' compensation claim, an employee must prove: (1) that he was an employee before the injury; (2) that he exercised

10

a right granted by the Act; and (3) that he was discharged and that the discharge was causally related to his filing a claim under the Act. Clemons, 184 Ill. 2d at 335-36, 704 N.E.2d at 406.

The ultimate issue concerning the element of causation is the employer's motive in discharging the employee. Clemons, 184 Ill. 2d at 336, 704 N.E.2d at 406. "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee". Hartlein, 151 Ill. 2d at 160, 601 N.E.2d at 728. For instance, an employer may terminate an employee for excess absenteeism, even if the absenteeism is caused by a compensable injury. Hartlein, 151 Ill. 2d at 160, 601 N.E.2d at 728. The mere existence of a valid or sufficient reason, however, does not defeat a retaliatory discharge claim. "[I]f an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees *and the trier of fact believes it*, the causation element required to be proven is not met." Clemons, 184 Ill. 2d at 336, 704 N.E.2d at 406. (Emphasis added). Furthermore, despite an ostensibly neutral absenteeism policy, where the actual purpose and effect of the scheme penalize employees for filing workers' compensation claims, the employer's action may in fact be retaliatory. See Hess v. Clarcor, Inc., 237 Ill. App. 3d 434, 450, 603 N.E.2d 1262, 1273 (1992) (upholding the trial court's denial of injunctive relief where the evidence of a facially neutral absenteeism policy, adopted for a legitimate business purpose and applied evenhandedly, did not support a finding of retaliatory intent on the part of the employer).

In the instant case, it is undisputed that Siekierka was a good employee of United Steel; that he exercised his rights under the Act; and that United Steel terminated his employment. The only issue is whether there is an issue of material fact as to whether there existed a causal connection between Siekierka's termination and the filing of his workers' compensation claim. United Steel has chosen to come forward with a valid nonpretextual basis for terminating Siekierka's

11

employment: his failure to return from authorized leave. There is testimony from United Steel's employees to support this assertion.

On the other hand, the evidence also supports an inference that United Steel's insurer set in motion a process that made it impossible for Siekierka to return to work within the time granted to him by United Steel. Siekierka presented evidence that his doctor, Delheimer, recommended surgery as of June 11, 2002, and that United Steel's insurer refused to accommodate the surgery and forced him to seek the opinion of an insurer-provided doctor, Shenker. Shenker was unavailable for consultation for four weeks and his "wait and see" recommendation cost Siekierka an additional four weeks. Siekierka's condition remained unchanged and ultimately the surgery Delheimer had recommended for June 11, 2002, took place on August 15, 2002. Although it was three months after the surgery that Delheimer released Siekierka to work, there is evidence he could have been released to work earlier; Delheimer testified that had he known Siekierka was in danger of losing his job, he would have released him earlier, and just before his surgery, Siekierka told Paul and Grant he would need four to eight weeks of recovery time. If Siekierka's surgery had taken place on June 11, 2002, it is conceivable he could have returned to work 10 weeks later, by the end of August 2002.

Furthermore, Paul did not inform Siekierka until July 31, 2002, after he was three weeks into Shenker's "wait and see" approach, that he had already used up 11 weeks of family medical leave and would be terminated if he did not return to work by the end of August. By that time, it was obvious Siekierka could not undergo surgery and recover in time to return to work within the time alloted. The United Steel employees testified that once aware of Siekierka's need for surgery they knew he would not be able to return to work within the amount of leave United Steel had provided him. Siekierka, on the other hand, before he received Paul's letter, had no idea United Steel was

12

giving him a finite amount of leave only and labored under the apparently false impression, conveyed by the "pretty positive" tenor of his interaction with United Steel, that he would be able to return to work after he recuperated from his injury.

United Steel's actions served to delay Siekierka's surgery at the same time he was left uninformed that the delay had the potential to cost him his job. When Siekierka was finally made aware of the possible consequence of his continued absence from work, he was faced with the option of pursuing his worker's compensation right to have the surgery or attempting to return to work without it. This is the kind of choice prohibited under Kelsay and if United Steel's intent was to create this dilemma, its motive was retaliatory. For these reasons, viewing the depositions, affidavits and exhibits liberally in favor of Siekierka, and bearing in mind United Steel has chosen to argue a valid nonpretextual basis for terminating Siekierka's employment, we consider there is a genuine issue of material fact as to whether there exists a causal nexus between Siekierka's discharge and the exercise of his rights under the Act.

For the foregoing reasons, the judgment of the circuit court of LaSalle County is reversed.

Reversed.

LYTTON, P.J., and HOLDRIDGE, J., concur.

13